

**Peter M. Moore**
703.852.7877 (direct)
786.280.0133 (mobile)
Peter.Moore@wilsonelser.com

November 7, 2025

**VIA ELECTRONIC MAIL**

2140 Edmondson Ave, LLC
13408 Querry Mill Road
Gaithersburg, MD 20878
c/o Brian S. Goodman
Goodman Law Group
9199 Reisterstown Road, Suite 213 C
Owings Mills, MD 21117
brian@goodmanlawgroupllc.com

| | | |
|---|---|---|
| Re: | Insured: | 2140 Edmondson Ave, LLC c/o Cecil Clarke |
| | Date of Loss: | 12 May 2025 |
| | Policy No.: | BCVBR070725 |
| | Policy Periods: | July 11, 2024 to July 11, 2025 |
| | GCCS File: | TP250826 |
| | Our File: | 27202.00001 |

Dear Brian,

I write to you on behalf of Certain Underwriters at Lloyd's, London and Convex Insurance UK Limited (collectively herein "Underwriters"), who issued the above referenced policy, policy number TCWP240030050, with policy period July 11, 2024 to July 11, 2025 (the "Policy"). The letter is in response to your demand for payment under the Policy on behalf of named insured 2140 Edmondson Ave, LLA for loss due to fire at the insured premises, 2140 Edmonson Ave, Baltimore, Maryland (the "Property"), on May 12, 2025.

Underwriters have reviewed your client's sworn proof of loss, the documents submitted at our request as part of our investigation of the claim, and the examination under oath ("EUO") of the insured's sole owner/member, Cecil Clarke, conducted on October 17, 2025. As you are also aware, the loss is currently under investigation by the U.S. Bureau of Alcohol, Tabacco and Firearms ("ATF") as a potential criminal arson. Underwriters continue to investigate the claim and awaits further information from the ATF and/or confirmation that the ATF investigation has been moved to inactive status. However, at this time, the ATF confirms this is an active and ongoing criminal investigation. Underwriters also await the results of a hard drive rebuild being conducted by Envista Forensics on a digital recording device recovered from the Property, and whether there is any recoverable video footage which may shed further light on the arson investigation. Underwriters recognizes that the ATF investigation may prove unsubstantiated and nothing in this letter is intended to suggest that the investigation will establish a loss due to arson, and/or that any insured will be criminally implicated. Underwriters reserve all rights and defenses under the Policy and as set forth herein, and as set forth in the prior correspondence regarding this claim from Gulf Coast Claims

8444 Westpark Drive, Suite 510 | McLean, VA 22102 | p 703.245.9300 | f 703.245.9301 | wilsonelser.com

Albany, NY | Atlanta, GA | Austin, TX | Baltimore, MD | Birmingham, AL | Boston, MA | Charlotte, NC | Chicago, IL | Dallas, TX | Denver, CO | Detroit, MI | Long Island, NY
Hartford, CT | Houston, TX | Indianapolis, IN | Jackson, MS | Las Vegas, NV | London, England | Los Angeles, CA | Louisville, KY | Madison, NJ | McLean, VA | Merrillville, IN
Miami, FL | Milwaukee, WI | Nashville, TN | New Orleans, LA | New York, NY | Orange County, CA | Orlando, FL | Philadelphia, PA | Phoenix, AZ | Portland, OR | Raleigh, NC
San Diego, CA | San Francisco, CA | Sarasota, FL | Seattle, WA | Stamford, CT | St. Louis, MO | Tyler, TX | Washington, DC | West Palm Beach, FL | White Plains, NY

323576031v.1

Services ("GCCS").

## Factual Background

This factual background is based on the information obtained to date in Underwriters' investigation, including review of available reports, photographs and discussions with our retained Origin & Cause expert ("O&C"), Robert Howarth, documents provided by Cecil Clarke, and our EUO of Mr. Clarke. A copy of Mr. Howarth's preliminary O&C report is enclosed with this letter. As set forth above, the ATF has yet to complete its investigation but advises that this loss remains the subject of an active criminal arson investigation.

This claim stems from a fire at 2140 Edmondson Avenue, Baltimore, Maryland (the "Property") on May 12, 2025, at or around 5:45p.m. The fire was initially reported by pedestrians who noticed fire on the loading dock. By the time emergency personnel responded, the buildings on the Property were engulfed.

The Property is owned by named insured 2140 Edmondson Ave, LLC. Mr. Clarke is the sole owner/member of the LLC. The LLC exists for the sole purpose of owning and maintaining the Property. The Property has a legal address of 2205 West Lanvale Street, Baltimore, Maryland 21216. The Property is comprised of two buildings and abuts Edmondson Avenue on the South side and West Lanvale on the North. Amtrak railroad lines run along the East side of the Property. The Property is comprised of two buildings. Building 1 is a four-floor warehouse, approximately 110,000 sq. ft., with a street address of 2140 Edmondson Ave. Building 2 is a single-story building, approximately 4,000 sq. ft, and a street address matching the legal address of the entire Property.

2140 Edmondson Ave, LLC owns the Property at issue in fee simple. Mr. Clarke purchased the Property in or around 2004 for a purchase price of $375,000, using a mortgage loan of $275,000. He subsequently paid off that mortgage. There was a mortgage in effect at the time of the fire loss for an equity line used to fund renovations at the Property. Underwriters paid off the mortgage following the loss, as the mortgagee was an additional insured on the Policy by endorsement.

The warehouse at the Property (Building 1) has been nominated for designation as a historic landmark in Baltimore, but, to date, does not have a historic designation. Amtrak maintains an easement on the Eastern side of the Property which passed with the Property when purchased by Mr. Clarke. Although, Amtrak has not used the easement since Mr. Clarke purchased the Property, it reached out to Mr. Clarke in or about 2023 to advise that it intends to use the easement as part of its Frederick Douglas Tunnel project. Amtrak also intends to use eminent domain to take possession of the front portion of the Property abutting Edmondson Avenue in order to construct a bridge over the new tunnel construction. Amtrak is expected to pay Mr. Clarke in excess of $700,000 as reimbursement for this taking.

The warehouse at the Property is comprised of four floors. The lower floor was leased to Allan Qadir d/b/a Mattress Spot at the time of the fire. Mr. Clarke renovated the second floor of the building as an office space from which he ran his real estate and construction businesses. The remainder of the building was empty, with the top two floors being used to store construction materials and tools not in use by Mr. Clarke's construction business.

The lower floor of the warehouse at 2140 Edmondson Avenue is used by Allan Qadir. No other portion of the Property is or has ever been leased. The lower floor was initially rented in 2015 to a company called FBI Recycling which made pressed pallets and cardboard. Mr. Clarke stated in his EUO that this arrangement lasted approximately three years and was done on a month-to-month basis without a formal lease. Mr. Clarke rented the space to Edwin Bautista for his mattress refurbishment business in February 2024 on a month-to-month basis, without a formal lease. In June 2024, Mr. Clarke learned that Mr. Bautista


sold the business to Allan Qadir who was now operating the mattress refurbishment business as "Mattress Spot." Mr. Clarke stated he had not been aware of the change and so required Mr. Qadir to execute a formal lease. The lease, executed August 1, 2024 and running from August 1, 2024 to July 31, 2024, stated a rental amount of $51,500, plus a $4,000 deposit. Mr. Qadir paid the rent in two lump sum payments: by check in the amount of $24,000 on August 7, 2024, and by check in the amount of $31,500 on December 9, 2024.

Mr. Clarke testified that he did not know Mr. Qadir before Mr. Qadir took over Mr. Bautista's mattress business, but admitted to knowing Mr. Qadir's brother, Fakhir Qadir. Fakhir Qadir previously rented another of Mr. Clarke's properties 924 E. Monument Street, Baltimore, Maryland approximately eight years ago. That property was also damaged by fire in 2018 while Fakhir Qadir rented the property. Per Mr. Clarke, the fire was ruled accidental. He made a claim for the loss which was paid. The building was damaged, but not a complete loss, and he subsequently sold the property. Mr. Clarke also reported another fire at a property he owned, 6 S. Poppleton Street, Baltimore, Maryland. Mr. Clarke made a claim for the loss and subsequently sold the property.

According to Mr. Clarke, Mr. Allan Qadir wanted to sign a five year lease at the Property so that he could make capital improvements to the space without worrying that he might lose the lease. Mr. Clarke stated that, initially, he did not want to sign a five year lease having no prior experience with Mr. Qadir, so the initial one year term was intended to be a trial period. Accordingly, in April 2025, Mr. Clarke and Mr. Qadir executed a second, four-year lease, set to begin August 1, 2025 and running through July 31, 2029 (the "Second Lease"). The Second Lease amount is $54,000 per year, with an initial lump sum of $40,000 to be paid at the signing of the lease. The Second Lease appears to have been executed on May 3, 2025, nine days prior to the fire. Both leases required Mr. Qadir to purchase and maintain property insurance in favor of Mr. Clarke. No such insurance was purchased and Mr. Clarke admits he took no steps prior to the fire to confirm whether Mr. Qadir had insurance. Mr. Clarke states that Mr. Qadir paid him the $40,000 lump sum at the time of the Second Lease signing in cash; specifically, in bound twenty dollar bills.

Mr. Clarke states that he did not deposit the $40,000 but kept it in his office at the Property. He provided the ATF with an itemization of how the money was spent, comprised of payments to Baltimore City and Montgomery County for property taxes, small deposits of between $3,000 and $7,000 to two checking accounts in his name totaling $16,650, and $4,100 in payments to purportedly install new doors on the first floor of the Property. Mr. Clarke to provided receipts for payment to Baltimore City and Montgomery County, as well as deposit receipts for the small value deposits. Mr. Clarke provided some receipts for amounts paid to the contractors who conducted the door installation; however, he states some of the work was done by day laborers whom he paid in cash.

Following the fire, Mr. Clarke formally cancelled the lease with Mr. Qadir in July 2025 pursuant to an agreement in which he would reimburse Mr. Qadir with monthly payments of $4,500, which he has been paying via checks to Hawkir Aziz, whom, according to Mr. Clarke, is Mr. Qadir's nephew. Mr. Clarke states that, other than the lease arrangements, he has never had any dealings with Mr. Qadir, and it is Mr. Aziz who ran the day-to-day of the mattress business at the Property.

At the time of the fire there was no working fire suppression system at the Property. According to Mr. Clarke, there was a break-in at the Property in 2018 or 2019 in which unknown persons stole the air compressor and copper piping from the system. A neighbor called the police who responded to the scene while the thieves were still at the Property, but the police did not capture the vandals. The system could not be pressurized and was turned off. Mr. Clarke had two companies, Capital Sprinkler and Fireline, prepare estimates to repair/upgrade the system in 2023 or 2024. He states he accepted one of the bids and that, had the fire not occurred, he expected to complete the repairs/upgrades shortly.

Between 2022 and 2024, Mr. Clarke states that he performed numerous upgrades to the Property with a total cost in excess of $800,000. These renovations were funded using an equity line on the Property. Mr. Clarke states that he replaced the roof, resurfaced the parking lot, replaced all lighting for the interior and exterior of the Property, redid much of the electrical lines, including the fuse box, as well as painting and other cosmetic upgrades. Mr. Clarke avers that this work was done to an existing "R&R" permit for general renovation, except for the electric upgrades which required a separate permit. Mr. Clarke states that some of the roofing repairs were done by a contractor, Cliff Roofing, the parking lot pavement was done by a contractor, the electric upgrades were done by contractor Dell Electric, and that he received invoices for this work, but that some of the invoices were destroyed in the fire. Mr. Clarke advises that the remainder of the work – painting, plumbing, carpentry – was done by day laborers, paid in cash, and that he has no receipts to account for that work. Mr. Clarke confirms that some of these renovations/improvements were taken as passive losses on the value of the Property, while others were taken as active losses and passed through to his personal income tax.

Mr. Clarke states that Mr. Aziz generally has four or five employees at the Property for the mattress business, but he does not track who they are, or when they come and go. Mr. Clarke states that the mattress business operated five or six days a week, but it varied. He does not know what hours the mattress business employees worked or when Mr. Aziz or his workers were last at the Property prior to the fire, but states that they were usually there until "later in the day." Mr. Clarke acknowledges that Mr. Aziz, and possibly his workers, had keys and access to the Property at any time. There are no key cards or other method to track who is coming in and out of the building. Mr. Clarke did not have a cleaning or maintenance service and there are no other third-parties with authorized access to the Property. Mr. Clarke had a burglar alarm at the Property but it was not working. He did not have surveillance cameras. He believes Mr. Aziz did have his own surveillance cameras on the lower level. He also states that the mattress business often had two to four box trucks parked at the Property and that there were box trucks at the Property at the time of the fire, though he is unsure how many.

Regarding the fire itself, Mr. Clarke states that prior to the fire he was last at the Property on Saturday, May 10, 2025, and left the Property around 1:30p. He learned of the fire from a friend, Eddie Richardson, who lives near the Property and called Mr. Clarke at home around 7pm on May 12, 2025, to let him know the building was burning. Mr. Clarke states that, while driving to the Property, he received another call from a neighbor stating that the entire building was burning, and this caused him to pull over and call Goodman Gable Gould, the public adjuster handling this claim. Mr. Clarke states he knew of Goodman Gable Gould because they assisted with adjusting the prior fire at 924 E. Monument Street involving Mr. Qadir's brother, Fakhir Qadir. Mr. Clarke arrived at the fire around 8p and stayed until 12:30p, at which point the fire was still going. Mr. Clarke states that one of the PA's from Goodman Gable met him at the fire and that Mr. Aziz was also present and may have stayed at the scene after Mr. Clarke left. Mr. Clarke recalls talking to Mr. Aziz and asking him if he knew what happened or how the fire started, but nothing specific about what they otherwise discussed. Mr. Clarke states that since the fire he has spoken to Mr. Aziz a few times to discuss the fire, but Mr. Aziz has no knowledge regarding how the fire started. Mr. Clarke avers that he does not know how the fire started and does not know if it was intentionally set. He states that, in addition to furniture, there were approximately 60 to 70 paintings and sculptures at the Property which he personally collected. He advises there was no cash or jewelry at the Property, no TVs, and no computers. Mr. Clarke also kept a 1967 Cadillac behind the Property which was destroyed in the fire.

Following the fire, Mr. Clarke avers that he turned everything over to Goodman Gable Gould who retained First Choice Services to do the initial work to secure the Property; though, he stated he later went back with a contractor, Cecil Page, to do additional boarding up and securing of the lower level of the Property. Mr. Clarke acknowledges a condemnation notice from Baltimore. Goodman Gable Gould commissioned inspection and reports regarding the condition of the Property from First Choice and Skarda & Associates Structural Engineers and both reports conclude the Property cannot be repaired and must be torn down.


Goodman Gable Gould commissioned three demolition estimates from Berg, AJ Adams, and General Paving.

Beyond tearing down the existing, damaged structure, Mr. Clarke has no current plans for the Property. He states that he reported the loss to his insurance broker, Hartford General, following the fire. He states that he speaks with Hartford General several times a year to confirm premiums are paid and answer questions but could not recall when he last spoke with Hartford General prior to the fire regarding this Property. He admits that he provided an interview to the ATF on July 18, 2025, regarding the fire and submitted to a polygraph test. He states that the ATF told him the results of the polygraph led them to believe he was not being completely honest with them. He also states that he unexpectedly ran into the lead ATF agent on Lombard Street in Baltimore while walking with his real estate agent, Douglas Kimble, to look at some properties. He avers this was simply a random encounter. He states that there was another person with the lead agent. Mr. Clarke denies any other meetings with the ATF, though we understand from the lead ATF agent that sometime after the fire loss at issue and prior to the meeting on Lombard Street, Mr. Clarke also appeared unexpectedly at the scene of another fire looking to speak with the ATF.

The ATF has yet to publish any conclusions about the cause of the fire or whether any person or persons are implicated. The ATF continues to investigate the loss as a potential criminal arson and is seeking and reviewing additional records and interviews with potential witnesses.

### **The Policy**

Underwriters insure named insured 2140 Edmondson Ave, LLC c/o Cecil Clark pursuant to the terms of a commercial property policy, policy number TCWP240030050, with policy period 11 July 2024 to 11 July 2025 (the "Policy"). The Policy is written on both buildings at 2140 Edmondson Avenue, with the warehouse (Building 1) insured for $4,800,000, and the maintenance building (Building 2) insured for $200,000. (Policy, Commercial Property Declarations.) The Policy also provides loss of income coverage up to $50,000.

The Policy provides coverage for loss due to fire. The insured's mortgagee, Dynasty LLC, is an additional insured on the Policy by endorsement. Underwriters paid the mortgage on the Property in full following the fire loss.

The Policy contains the following potentially relevant exclusion:

> **2.** We will not pay for loss or damage caused by or resulting from any of the following:
> \*\*\*
> **h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.
> This exclusion:
> > **(1)** Applies whether or not an act occurs during your normal hours of operation;
> > **(2)** Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by you employees (including temporary employees and leased workers) or authorized representatives is not covered.

(Policy, Special Cause of Loss Form, pgs. 3, 4.) The Policy also contains the following potentially relevant condition:

323576031v.1



**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**
This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
    **1.** This Coverage Part;
    **2.** The Covered Property;
    **3.** Your interest in the Covered Property; or
    **4.** A claim under this Coverage Part.

(Policy, Commercial Property Conditions, pg. 1.)

**2. Duties In The Event Of Loss**
    **a.** You must see that the following are done in the event of loss:
        \*\*\*
    **(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.
    **(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
    **(7)** Cooperate with us in the investigation or settlement of the claim.
        \*\*\*
    **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

(Policy, Building and Personal Property Coverage Form, pgs. 10-11.)

**<u>Coverage Position</u>**

As set forth at the outset of this letter, the loss is currently under investigation by the ATF as a potential criminal arson. Underwriters continue to investigate the claim and awaits further information from the ATF and/or confirmation that the ATF investigation has been moved to inactive status. However, at this time, the ATF confirms this is an active and ongoing criminal investigation. Underwriters also await the results of a hard drive rebuild being conducted by Envista Forensics on a digital recording device recovered from the Property, and whether there is any recoverable video footage which may shed further light on the arson investigation. Underwriters wish to note the insured's duties in the event of a loss, including the responsibility to cooperate as set forth above. (Policy, Building and Personal Property Coverage Form, pgs. 10-11.) Underwriters acknowledge and appreciate the insured's cooperation to date.

Underwriter's position is based on the facts and circumstances presently known to it. Underwriters recognizes that the ATF investigation may prove unsubstantiated and that the digital recording device currently being rebuilt may not recover any relevant information, and nothing in this letter is intended to suggest that the investigation will definitively establish a loss due to arson, and/or that any insured will be criminally implicated. Nonetheless, should it be determined that this loss is due to arson and/or that any insured is implicated in such arson, Underwriters reserve all rights to assert the Policy's Concealment, Misrepresentation or Fraud condition and/or Dishonest or Criminal Act exclusion as a defense to coverage. (Policy, Commercial Property Conditions; Cause of Loss Special Form.)



- 7 -

**Conclusions**

Underwriters continue to investigate the claim and await further information from the ATF in addition to any information which may be recovered from the digital recording device being rebuilt by Envista Forensics. Underwriters reserve all rights under the Policy and specifically reserve the right to asset the Policy's Concealment, Misrepresentation or Fraud condition and/or Dishonest or Criminal Act exclusion as a defense to coverage in the event evidence develops to prove that the loss occurred due to arson and to the extent any insured is implicated in the arson.

If you are aware of any other insurance policies that may provide coverage for this claim, we recommend you place those insurers on notice of the Lawsuit immediately, to the extent you have not already done so.

To the extent there is any additional information and/or documents you would like us to consider, please forward those documents to our attention as soon as possible for our review and consideration.

To the extent you believe Underwriters' coverage position is incorrect and/or to the extent you have additional information that you believe may affect Underwriters' coverage position, please advise us of such disagreement and/or additional information as soon as practicable.

Nothing herein is intended to waive any rights Underwriters may have under the Policy or at law, all such rights being expressly reserved. Underwriters reserves all rights under the Policy, including but not limited to the right to further reserve rights under the Policy, and the right to seek a declaratory judgment as to its rights and obligations under the Policy.

Best regards,

Wilson Elser Moskowitz Edelman & Dicker LLP

Peter M. Moore

323576031v.1